# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GOVERNMENT OF GUAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-2487 (KBJ) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The island of Guam has been a territory of the United States for more than a

century, and for most of the period between 1898 and the mid-1900s, Guam served as a

central base of operations for the United States Navy in the South Pacific.  (Am.

Compl., ECF No. 7, ¶ 6.)  Early on, the Navy created a major landfill on the island—the

Ordot Landfill—to support its mission, and this dump was used to dispose of munitions

and chemicals, as well as military and civilian waste, for decades.  (*Id.* ¶¶ 7, 11.)  As

relevant here, by the time the United States government relinquished control of Guam

to civilian authorities in the year 1950, the Ordot Landfill contained, and would

continue to receive, significant quantities of trash and hazardous waste that posed a

serious risk to the surrounding environment.  As a protectorate of the United States,

Guam is subject to U.S. environmental laws, and pursuant to an agreement with the U.S.

Environmental Protection Agency ("the EPA") that arose under the Clean Water Act

("CWA"), 33 U.S.C. §§ 1251–1387, the local Guamanian authorities shut down the

Ordot Landfill in 2011, and commenced the arduous (and quite expensive) task of

cleaning up the landfill and permanently containing its contents so as to prevent hazardous waste leaks that threatened rivers, waterways, and the Pacific Ocean. (*See id.* ¶¶ 12, 14.) The Government of Guam ("Guam" or "Plaintiff") has now brought the instant three-count complaint against the United States ("United States" or "Defendant") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601–75. Guam alleges that, because the United States substantially contributed to the environmental contamination at the Ordot Landfill, the United States should pay the full $160,000,000 cost of cleaning up the dump under CERCLA's section 107(a)'s cost-recovery mechanism (*see* Am. Compl. ¶¶ 23, 25 (Count I)), or should at least pay its fair share of the cleanup costs under CERCLA's section 113(f)(3)(B)'s contribution mechanism (*see id.* ¶ 31 (Count III)).[1] Guam also seeks a declaratory judgment that establishes the United States's liability for "future removal and remediation costs incurred by Guam[.]" (*Id.* ¶ 29 (Count II).)

Before this Court at present is the United States's motion to dismiss Guam's complaint under Federal Rule of Civil Procedure 12(b)(6). (*See* United States' Mem. in Supp. of Mot. to Dismiss Guam's Am. Compl. ("Def.'s Mem."), ECF No. 27-1.) In its motion to dismiss, the United States argues that Guam cannot compel the United States to pay for the closure and remediation of the Ordot Landfill under CERCLA's section 107(a) because, under the circumstances presented here, CERCLA only provides Guam with a claim for contribution under section 113(f)(3)(B) (*see id.* at 28–29), and,

---

[1] In the context of CERCLA, courts commonly refer to the cost-recovery claim embodied in section 9607(a) of Title 42 of the United States Code as a "section 107(a)" action and they call the contribution claim embodied in section 9613(f)(3)(B) of Title 42 of the United States Code a "section 113(f)(3)(B)" action. This Memorandum Opinion generally employees that same nomenclature.

unfortunately for Guam, any such contribution action must be dismissed as untimely, per the applicable three-year statute of limitations (*see id.* at 36–39).[2] The United States's argument hinges on the established view that section 107(a) claims and section 113(f)(3)(B) claims are mutually exclusive, and the contention that Guam's circumstances fit the latter provision, because Guam previously executed a 2004 Consent Decree with the EPA that purportedly "resolve[d] its liability to the United States" for the cleanup and closure of the Ordot Landfill, and the United States considers that agreement to be a cognizable "settlement" for section 113(f)(3)(B) purposes. *See* 42 U.S.C. § 113(f)(3)(B). Guam responds that the 2004 Consent Decree did not "resolve its liability" within the meaning of section 113(f)(3)(B), nor does that agreement qualify as a CERCLA "settlement," and thus, Guam maintains that it is not precluded from bringing a cost-recovery claim under section 107(a). (*See* Government of Guam's Mem. in Opp'n to the United States of America's Mot. to Dismiss Guam's Am. Compl. ("Pl.'s Opp'n"), ECF No. 30, at 15–18.)

On September 30, 2018, this Court issued an Order that **DENIED** the United States's motion to dismiss. (*See* Order, ECF No. 37.) This Memorandum Opinion explains the reasons for that Order. In short, the Court concludes that a cost-recovery action under section 107(a) remains available to Guam because the 2004 Consent Decree plainly left the issue of liability for the costs associated with the Ordot Landfill cleanup unresolved, and therefore, section 113(f)(3)(B)'s contribution mechanism was not triggered. Consequently, and to that extent, the Court finds that the United States's

---

[2] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

motion to dismiss Guam's cost-recovery claim under section 107(a) must be denied.[3]

## I.     BACKGROUND[4]

### A. The Ordot Landfill

Over one hundred years ago, the United States captured the island of Guam from Spain and began administering the island as a United States territory.  (*See* Am. Compl. ¶ 6.)  Between 1898 and 1950, the United States Navy "unilaterally governed and operated" Guam (*id.*), and at some point during its administration of the island's operations, the Navy established the Ordot Landfill to dispose of the waste being generated on the island (*see id.* ¶ 7).  In 1950, the Navy handed Guam, and the landfill, over to the newly-established civilian government (*see id.* ¶ 10), and the Guamanian authorities continued to operate the Ordot Landfill as a dump until the facility was officially closed in 2011 (*see id.* ¶ 14).

Notably, throughout its lifespan, the Ordot Landfill accepted waste from both military and civilian entities.  (*See id.* ¶ 11.)  The Government of Guam alleges that the United States military deposited "[s]ignificant quantities of munitions and chemicals" at the dump, including hazardous substances such as DDT and Agent Orange.  (*Id.*)  At the same time, the Ordot Landfill served as the only public dump site on the island of Guam

---

[3] The Amended Complaint pleads a cost-recovery claim under section 107(a) and a contribution claim under section 113(f)(3)(B) "in the alternative."  (Am. Compl. ¶ 31.)  Given this Court's conclusion that Guam can maintain its cost-recovery claim against the United States under section 107(a), the alternative cause of action in Plaintiff's amended complaint must be **DISMISSED**.

[4] The following facts are derived from the Government of Guam's amended complaint and certain exhibits that are referenced in the complaint and are necessary to this Court's resolution of the pending motion.  *See Azima v. RAK Investment Auth.*, 305 F. Supp. 3d 149, 159 (D.D.C. 2018) (noting that, in the Rule 12(b)(6) setting, all reasonable inferences must be viewed "in the light most favorable to the plaintiff" and that this Court may consider "the facts alleged in the complaint . . . and documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss" (internal quotation marks and citation omitted)).

until 2011 (*see id.*), and it appears that even though the landfill "reached capacity in 1986, it continue[d] to receive virtually all of the industrial and municipal waste from the civilian population of Guam" for a significant period of time thereafter, *United States v. Gov't of Guam*, 02-00022, 2008 WL 216918, at *1 (D. Guam Jan. 24, 2008). Thus, "[w]hat was once a valley [became] at least a 280-foot mountain of trash." *Id.* (describing the Ordot Landfill back in 2008).

For present purposes, it is important to note that because the Ordot Landfill was built in the pre-World War II era, it was not designed with modern environmental practices in mind, and thus, did not have certain safeguards to shield the surrounding environment from contamination. For example, "[d]uring its years of operation, the Ordot Landfill was . . . uncapped at its top." (Am. Compl. ¶ 12.) Consequently, "[t]he landfill absorbed rain and surface water" from storms and other sources, and this water "percolated through the landfill and picked up contaminants." (*Id.*) In addition, since the landfill was also "unlined on its bottom[,]" the contaminated water—which is known as "leachate"—leaked out of the Ordot Landfill into the nearby Lonfit River, and the river carried hazardous materials from the landfill out into the Pacific Ocean. (*Id.*)

The EPA has been aware of these and other environmental problems with the Ordot Landfill for many decades; indeed, the agency placed this site on the National Priorities List as far back as 1983, which indicated its "priority [status] for the expenditure of funds to respond to the release or threatened release of hazardous substances." (*Id.* ¶ 13.) Moreover, starting in 1986, the EPA began issuing administrative orders under the CWA, directing Guam's civilian government to halt the further discharge of contaminants from the Ordot Landfill into the rivers and oceans of

Guam. *See Guam*, 2008 WL 216918, at *1. Over the next fifteen years, the EPA regularly ordered Guam to devise a feasible plan for containing and disposing of the waste at the landfill, but Guam did not provide a plan that satisfied the agency. *See id.*

### B. The EPA's CWA Lawsuit And The Resulting Consent Decree

The EPA finally filed a lawsuit against Guam in 2002, "asserting that leachate was discharging from the Ordot Landfill into the Lonfit River and two of its tributaries" in violation of the CWA. (Am. Compl. ¶ 14.) The EPA's legal action sought (1) "[a]n injunction ordering the Government of Guam to comply with the [CWA]"; (2) civil monetary penalties; (3) and court orders that required Guam to file timely and complete applications for any required discharge permits and forbade Guam from allowing further unpermitted discharges from the landfill. (CWA Compl., Ex. 2 to Decl. of Matthew Woolner in Supp. of Def. United States' Mot. to Dismiss ("Woolner Decl."), ECF No. 27-2, at 13 (Prayer for Relief).) Ultimately, rather than litigating these CWA claims in court, the parties entered into a consent decree in 2004 to resolve the EPA's lawsuit. (*See* 2004 Consent Decree, Ex. 3 to Woolner Decl., ECF No. 27-2, at 16–45.)

The 2004 Consent Decree between Guam and the EPA required Guam to pay a relatively modest civil penalty (*see id.* ¶ 5); mandated that Guam close the Ordot Landfill and cease the discharge of pollutants into the Lonfit River (*see id.* ¶ 8); and required Guam to construct a new municipal landfill to replace the Ordot Landfill (*see id.* ¶ 9). Significantly for present purposes, despite imposing these obligations on Guam, the Consent Decree specifically provided that the agreement was "based on the pleadings, before taking testimony or adjudicating any issue of fact or law, and without any finding or admission of liability against or by the Government of Guam[.]" (*Id.* at 18 (Therefore Clause).)

The 2004 Consent Decree also contained a number of provisions that specified the claims that the EPA was relinquishing as part of the settlement and the rights the United States retained notwithstanding the parties' agreement. First, the Consent Decree expressly stated that

> [e]ntry of this Consent Decree and compliance with the requirements herein shall be in full settlement and satisfaction of the civil judicial claims of the United States against the Government of Guam as alleged in the Complaint filed in this action through the date of the lodging of the Consent Decree.

(*Id.* ¶45.) The Consent Decree also provided that

> [n]othing in this Consent Decree shall limit the ability of the United States to enforce any and all provisions of applicable federal laws and regulations for any violations unrelated to the claims in the Complaint or for any future events that occur after the date of lodging of this Consent Decree.

(*Id.* ¶ 46.) The Consent Decree further stated that "[e]xcept as specifically provided herein, the United States does not waive any rights or remedies available to it for any violation by the Government of Guam of federal and territorial laws and regulations." (*Id.* ¶ 48.)

In accordance with the terms of the Consent Decree, which, as noted, required the "complete closure of [the] Ordot Dump" and the "implementation of [a] post-closure plan" (*id.* ¶ 8(h)), Guam began taking steps to close the Ordot Landfill and to put an end to the leaching of pollutants from that dump. Guamanian officials officially ceased operations at the Ordot Landfill in 2011, and "[r]emediation and closure work" began "in December 2013." (*Id.* ¶ 14.) That remediation work, "which include[s] capping the landfill, installing storm water management ponds, leachate storage tanks

and a sewer line, . . . is still ongoing" (*id.*), and "Guam expects costs of remediation . . . to exceed approximately $160,000,000" (*id.* ¶ 15).

### C. Procedural History

On March 2, 2017, Guam filed the instant CERCLA action against the United States to recoup its landfill-closure and remediation costs. (*See* Compl., ECF No. 1.) On May 19, 2017, Guam filed the operative amended complaint, which contains three counts that collectively allege that the United States is liable for at least some, if not all, of the costs that Guam has incurred in closing and remediating the Ordot Landfill. (*See* Am. Compl. ¶¶ 32–34.) The first count contends that, because the United States Navy contributed hazardous waste to the Ordot Landfill and managed that landfill for many decades (*see id.* ¶ 19), Guam is entitled to recover all of the "removal and remediation costs" it incurred at or "related to the Ordot Landfill, plus interest" from the United States pursuant to section 107(a) of the CERCLA (*id.* ¶ 25). The second count seeks "a declaratory judgment of liability" to the effect that the United States will pay for Guam's future expenses relating to the remediation of the Ordot Landfill under CERCLA's section 113(g)(2). (*Id.* ¶¶ 29, 33.) The third count is a claim in the alternative for contribution under section 113(f)(3)(B) of CERCLA; Guam maintains that, even if it is not entitled to recover the full costs of remediation and closure of the Ordot Landfill, the United States must nevertheless pay "for all [such] costs in excess of Plaintiff's fair and equitable share of costs." (*Id.* ¶ 31.)

On November 27, 2017, the United States filed a motion to dismiss Guam's amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (*See* Def.'s Mem.) In its motion, the United States first argues that Guam cannot recover its costs for remediating the Ordot Landfill

under section 107(a) because Guam resolved its liability for that cleanup in the 2004 Consent Decree, and a contribution claim under section 113(f)(3)(B) is "the exclusive CERCLA remedy for the costs a liable party is compelled to incur pursuant to a judicially-approved settlement with the United States." (*Id.* at 28.)  The United States further asserts that, "because CERCLA imposes a three-year statute of limitations on contribution claims[,]" Guam "waited far too long after settling its liability in 2004" to bring its alternative claim for contribution under section 113(f)(3)(B).  (*Id.* at 27.) Thus, from the United States's perspective, Guam has no right to recover under either section 107(a) or section 113(f)(3)(B) at this time, and therefore, the Court should "dismiss Guam's amended complaint with prejudice." (*Id.* at 40.)

Guam's opposition challenges the United States's understanding of the applicable law on several grounds.  Most significantly, Guam argues that its right to maintain a contribution action under section 113(f)(3)(B) was never triggered because Guam had not "resolved its liability . . . [for] a response action or for some or all of the costs of such action" in the context of "an administrative or judicially approved settlement[,]" as the text of section 113(f)(3)(B) requires.  (Pl.'s Opp'n at 20.)  Guam insists that the parties "did not resolve response cost liability" in the 2004 Consent Decree, because the provisions of that agreement left Guam fully exposed to future liability under CERCLA.  (*Id.* at 16; *see also id.* at 26–40.)  Moreover, because the 2004 Consent Decree was "expressly limited to the CWA" (*id.* at 16), Guam argues that it does not qualify as a "settlement agreement" giving rise to a cause of action for contribution under CERCLA's section 113(f)(3)(B) (*id.*; *see also id.* at 40–48).  Indeed, Guam asserts that it has not heretofore pursued a contribution claim against the United

States *precisely because* it is not entitled to do so, given that its liability for the Ordot Landfill cleanup costs remains unresolved. (*See id.* at 20 n.12.) Thus, in Guam's view, a cost-recovery action under section 107(a) is appropriate and legally available, and this Court should not dismiss the instant cost-recovery claim.

The United States's motion to dismiss became ripe for decision on January 8, 2018. (*See* Def.'s Mem.; Pl.'s Opp'n; United States' Reply in Supp. of its Mot. to Dismiss ("Def.'s Reply"), ECF No. 33.) This Court held a hearing on May 15, 2018, and on September 30, 2018, the Court issued an Order denying the United States's motion to dismiss.

## II.   LEGAL STANDARDS

### A.  Motions To Dismiss Under Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must comply with Rule 8, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), and it must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). A claim is plausible on its face when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Therefore, even though a complaint "'does not need detailed factual allegations,' the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland*

*Sec.*, 892 F.3d 332, 343 (D.C. Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In evaluating whether a complaint has managed to set forth sufficient factual allegations, a court must "accept the plaintiff's factual allegations as true and construe the complaint liberally, granting plaintiff the benefit of all inferences that can reasonably be derived from the facts alleged." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018) (internal quotation marks, alterations, and citation omitted). The court generally may not consider matters beyond the pleadings, *see Patterson v. United States*, 999 F. Supp. 2d 300, 306 (D.D.C. 2013), but a limited exception to this rule does allow a court to consider "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice[,]" *Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A court may also review "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Mills v. Hayden*, 284 F. Supp. 3d 14, 17 (D.D.C. 2018).

Finally, to the extent that a defendant's 12(b)(6) motion rests on the argument that a plaintiff's claim falls outside the applicable statute of limitations, "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Momenian v. Davidson*, 878 F.3d 381, 387 (D.C. Cir. 2017) (internal quotation marks and citation omitted). "A complaint will be dismissed under Rule 12(b)(6) as 'conclusively time-barred' if 'a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure

the deficiency.'" *Id.* (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir.

1996)). Put another way, only "[i]f no reasonable person could disagree on the date on

which the cause of action accrued [may] the court [] dismiss a claim on statute of

limitations grounds." *Wash. Metro. Area Transit Auth. v. Ark Union Station, Inc.*, 268

F. Supp. 3d 196, 204 (D.D.C. 2017) (internal quotation marks and citation omitted).

### B. Legal Actions Brought Under CERCLA

Congress enacted CERCLA in 1980 "in response to the serious environmental

and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51,

55 (1998). The statute is designed to "promote the timely cleanup of hazardous waste

sites and to ensure that the costs of such cleanup efforts [a]re born by those responsible

for the contamination[,]" *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S.

599, 602 (2009) (internal quotation marks and citation omitted), and to achieve these

goals, Congress "impose[d] strict liability for environmental remediation" of any

hazardous waste, including waste that was initially "disposed of according to then-

acceptable practices before [it was] known to be hazardous[,]" *Lockheed Martin Corp.*

*v. United States*, 833 F.3d 225, 227 (D.C. Cir. 2016). Thus, CERCLA "reach[es] back

indefinitely into the past to make a[n] [entity] liable for the cleanup of hazardous

materials it may have [properly] disposed of decades ago." John L. Ropiequet,

*Environmental Law Litigation Under CERCLA*, 47 Am. Jur. Trials § 1 (April 2018

Update).

The instant case centers on the text of two of CERCLA's remedial provisions:

(1) section 107(a)'s cost-recovery mechanism, which is codified at section 9607(a) of

Title 42 of the United States Code, and (2) section 113(f)(3)(B)'s contribution

mechanism, which is codified at section 9613(f)(3)(B) of Title 42 of the United States

Code.  These two provisions work in harmony to encourage response actions such as "removal[s]" (*i.e.*, carting away hazardous waste from a given waste site) or "remediation[s]" (*i.e.*, taking action that ensures that hazardous waste will never escape from its current waste site), 42 U.S.C. § 9601(23)–(25); *see also Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1117 (9th Cir. 2017), and they provide the actor with the means to ensure that the costs of such response activities are covered, while assuring any payor that such costs will ultimately be allocated properly among all "potentially responsible parties" (hereinafter referred to as "PRPs"), *see United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007).

Specifically, section 107(a) "creates a cause of action through which entities that have incurred costs cleaning up contaminated sites may sue to recover cleanup costs from" four categories of PRPs, *Lockheed Martin*, 833 F.3d at 227—the present owners of the facility; the past owners of the facility; individuals who disposed of hazardous waste at that site; and individuals who transported hazardous waste to these facilities, *see* 42 U.S.C. § 9607(a)(1)–(4).  When sued, such PRPs are usually subject to joint-and-several liability for the entire cost of cleaning up the hazardous waste site, meaning that a single defendant sued under section 107(a) can be held legally responsible for all of the cleanup costs even if other PRPs also disposed of hazardous pollutants at that site. *See, e.g.*, *Chem-Nuclear Sys., Inc. v. Bush*, 292 F.3d 254, 259 (D.C. Cir. 2002).  *But see Bernstein v. Bankert*, 733 F.3d 190, 201 (7th Cir. 2013) (explaining that, while joint-and-several liability is the default presumption, if "the defendant can demonstrate that there is a reasonable basis for determining the contribution of each cause to a single harm[,]" then a court considering a section 107(a) claim may apportion the costs of the

cleanup in proportion to the responsibility of the PRPs for those costs).

Through section 113(f), Congress has provided a mechanism for PRPs who have been held liable for cleanup costs to seek contribution from other responsible parties, thereby ensuring that the costs of cleaning up hazardous waste sites are divided fairly among all PRPs. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 162–63 (2004). As relevant here, a PRP may bring an action for contribution under section 113(f)(3)(B) if that PRP

> has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement[.]

42 U.S.C. § 9613(f)(3)(B); *see also Atl. Research Corp.*, 551 U.S. at 132 n.1 ("Section 113(f)(3)(B) permits private parties to seek contribution after they have settled their liability with the Government.").[5]

Thus, when coupled together, the remedies available under sections 107(a) and 113(f) serve to ensure that PRPs pick up the tab for the cleanup costs that occur with respect to hazardous waste sites and that PRPs share the costs in an equitable manner. In this way, sections 107(a) and 113(f) provide "complementary yet distinct" causes of action. *Id.* at 138. And because these statutory provisions establish "distinct remed[ies] available to persons in different procedural circumstances[,]" *Bernstein*, 733 F.3d at 202, every circuit to have addressed the issue has held that claims for cost-recovery under section 107(a) and claims for contribution under section 113(f)(3)(B) are exclusive, in the sense that a CERCLA plaintiff cannot seek to advance both claims

---

[5] Section 113(f)(1) parallels section 113(f)(3)(B), insofar as it bestows upon PRPs a cause of action for contribution, but only once they have been found liable in the context of a fully litigated section 106(a) or section 107(a) action. *See* 42 U.S.C. § 9613(f)(1).

against the same defendant at the same time, *see* Justin R. Pidot & Dale Ratliff, *The Common Law of Liable Party CERCLA Claims*, 70 Stan. L. Rev. 191, 226–27 (2018).[6] What is more, courts routinely evaluate the availability of a cost-recovery claim under section 107(a) by determining whether the circumstances that give rise to a contribution claim under section 113(f) have occurred. *See, e.g.*, *Asarco*, 866 F.3d at 1127 (examining whether a settlement agreement has "resolved liability" in order to assess the availability of a section 107(a) claim); *Bernstein*, 733 F.3d at 207–08 (same). The instant dispute concerns whether, and to what extent, Guam can pursue either of these remedies in this case.[7]

## III.    ANALYSIS

In its motion to dismiss, the United States maintains that Guam is precluded from seeking cost-recovery under CERCLA's section 107(a) because the prescriptions of section 113(f)(3)(B) apply to the circumstances presented here. As noted, and as the amended complaint itself suggests, cost-recovery claims under CERCLA section 107(a) and contribution claims under CERCLA section 113(f)(3)(B) are exclusive of one another, such that Guam is permitted to proceed against the United States for full cost

---

[6] *See also Asarco*, 866 F.3d at 1117; *Bernstein*, 733 F.3d at 206; *Solutia, Inc., v. McWane, Inc*, 672 F.3d 1230, 1236–37 (11th Cir. 2012); *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 603–04 (8th Cir. 2011); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 229 (3d Cir. 2010); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 128 (2d Cir. 2010); *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 458 (6th Cir. 2007).

[7] Although not pivotal to the outcome of this case, it is noteworthy that the two causes of action at the center of this dispute have different statutes-of-limitations periods. *See Asarco*, 866 F.3d at 1117. The CERCLA plaintiff who intends to file a lawsuit under section 107(a) must do so within six years of the "initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). Meanwhile, an action under section 113(f) must commence no later than three years after "the date of judgment in any [CERCLA action]" or within three years of the entry of "a judicially approved settlement with respect to such costs or damages." *Id.* § 9613(g)(3)(B).

recovery under section 107(a) only if Guam's right to contribution under section 113(f)(3)(B) has not been triggered.[8]  Thus, the key questions that the pending motion to dismiss presents is whether the 2004 Consent Decree "resolve[d] [Guam's] liability" for the response action or response costs that Guam undertook with respect to the Ordot Landfill and also qualifies as a "settlement" within the meaning of section 113(f)(B)(3).  (*Compare* Def.'s Mem. at 28–31 (discussing the resolution of liability issue) *and id.* at 31–34 (arguing that a settlement under the CWA can trigger a section 113(f)(3)(B) action) *with* Pl.'s Opp'n at 22–40 (contending that Guam's liability for the Ordot Landfill cleanup costs was not resolved in the 2004 Consent Decree) *and id.* at 40–47 (contending that a CWA consent decree cannot qualify as a "settlement" under section 113(f)(3)(B)).)

For the reasons explained below, this Court concludes that the 2004 Consent Decree did not trigger Guam's contribution rights under section 113(f)(3)(B).  In accordance with the persuasive reasoning of the Sixth and Seventh Circuits in CERCLA cases that are substantially similar to this one, this Court finds that whether or not an agreement for the removal or remediation of hazardous waste "resolves" liability for section 113(f)(3)(B) purposes turns on the terms of the agreement, and that, here, the 2004 Consent Decree did not resolve Guam's liability for the Ordot Landfill cleanup given the broad, open-ended reservation of rights, the plain non-admissions of liability, and the conditional resolution of liability that that agreement contains.  Thus, the

---

[8] Although the D.C. Circuit has not yet made this particular pronouncement and Guam's counsel refused to concede at the motion hearing that Guam cannot maintain *both* a section 107(a) cost-recovery claim *and* a section 113(f) contribution claim simultaneously (*see* Hr'g Tr. at 16:4–13), the amended complaint quite clearly seeks full cost recovery under section 107(a) and pleads contribution under section 113(f) "in the alternative" (Am. Compl. ¶¶ 31, 34), and a party cannot amend its complaint through subsequent argument, *see Hudson v. Am. Fed'n of Gov't Emps.*, 308 F. Supp. 3d 388, 396 (D.D.C. 2018).

statutorily prescribed conditions for bringing a contribution claim under section 113(f)(3)(B) have not been satisfied, which means that Guam is not precluded from maintaining its section 107(a) claim against the United States.

A. **To "Resolve" Liability Within The Meaning Of Section 113(f)(3)(B), The Agreement At Issue Must Decide Or Determine That The Claimant PRP Is Liable For The Costs Of A Response Action**

CERCLA nowhere defines the phrase "resolved its liability," which, as noted, is one of the veritable linchpins of section 113(f)(3)(B). *See* 42 U.S.C. § 9613(f)(3)(B) (providing an action for contribution to "[a] person who has *resolved its liability* to the United States or a State for some or all of a response action" (emphasis added)). Therefore, consistent with ordinary principles of statutory construction, this Court must interpret that phrase in accordance with its plain meaning. *See S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 376–77 (2006) (citation omitted). The ordinary meaning of the verb "resolve" is "[t]o find an acceptable or even satisfactory way of dealing with []a problem or difficulty[.]" *Black's Law Dictionary* 1504 (10th ed. 2014); *see also* Merriam-Webster Dictionary Online (defining "resolve" to mean "to deal with successfully," "reach a firm decision about," or "work out the resolution" of something).[9] Thus, Congress's invocation of the word "resolved" suggests an "element of finality[,]" *Asarco*, 866 F.3d at 1122, meaning that the issue has been "decided, determined, or settled—finished, with no need to revisit[,]" *Bernstein*, 733 F.3d at 211. One reasonably concludes, then, that "resolving" liability requires the parties to have reached a "firm decision about liability" such that the "the question of liability" is no longer "susceptible to further dispute or negotiation." *Asarco*, 866 F.3d at 1122.

---

[9] *See* https://www.merriam-webster.com/dictionary/resolve (last visited June 27, 2018).

Given this understanding, it is clear to this Court—as it was to the Sixth, Seventh, and Ninth Circuits—that liability with respect to cleaning up a hazardous waste site is not "resolved" simply and solely because interested parties have "sign[ed] a settlement agreement" concerning the response actions that will be taken at the site, *Bernstein*, 733 F.3d at 213, or because one or more PRPs have "cut a check" made payable to the United States, *Fla. Power Corp. v. FirstEnergy Corp.*, 810 F.3d 996, 1006 (6th Cir. 2015). Instead, "[t]o meet the statutory trigger for a contribution action under [section 113(f)(3)(B)], the nature, extent, or amount of a PRP's *liability* must be decided, determined, or settled, at least in part, by way of agreement with the EPA." *Bernstein*, 733 F.3d at 212 (emphasis in original); *see also Asarco*, 866 F.3d at 1122 (endorsing and adopting that definition); *Fla. Power*, 810 F.3d at 1003 (same).

Of course, there exists no formulaic means of determining when a particular settlement agreement has "decided, determined, or settled" the "nature, extent, or amount" of an entity's liability, *Bernstein*, 733 F.3d at 212, and, for present purposes, therein lies the rub. Each superfund dispute is unique, and every settlement agreement comes about through individualized negotiations between parties who have idiosyncratic concerns that inform the final contents of the contract they create. The circuits appear unanimous in their conclusion that, to best evaluate the parties' intent given this conglomeration of circumstances, a court must "look to the specific terms of the agreement" and ascertain whether, based on the provisions in the settlement agreement, the parties intended to resolve the plaintiff's liability within the meaning of section 113(f)(3)(B). *Fla. Power*, 810 F.3d at 1001; *see also Asarco*, 866 F.3d at 1125 ("Whether this test is met depends on a case-by-case analysis of a particular

agreement's terms."); *Bernstein*, 733 F.3d at 213 ("Whether or not liability is resolved through a settlement simply is not the sort of question which can or should be decided by universal rule. Instead, it requires a look at the terms of the settlement on a case-by-case basis.").

In this regard, when the agreement that is subject to interpretation is a federal consent decree, its "construction . . . is essentially a matter of contract law." *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007) (internal citation and quotation marks omitted). Moreover, contracts to which the United States is a party must be interpreted according to the precepts of federal common law. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) ("We have held that obligations to and rights of the United States under its contracts are governed exclusively by federal law."). Therefore, a consent decree between the federal government and another party must also be interpreted in light of the federal common law of contracts. *See United States v. Volvo Powertrain Corp.*, 854 F. Supp. 2d 60, 64 n.1 (D.D.C. 2012); *see also Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997) (explaining that this circuit typically derives the rules governing the federal common law of contracts from the Second Restatement of Contracts since "those principles represent the 'prevailing view' among the states").[10]

Where the courts of appeals diverge is with respect to *how* one best interprets

---

[10] Guam's suggestion that the 2004 Consent Decree must be interpreted according to the precepts of state contract law—in this case, the law of Guam—ignores the different practices of this Circuit with respect to this issue. (*See* Pl.'s Opp'n at 20–22.) The Sixth Circuit appears to have taken the approach that state common law governs with respect to its interpretation of administrative orders by consent and consent decrees. *See Fla. Power*, 810 F.3d at 1001 (applying Ohio law to an administrative order by consent); *John B. v. Emkes*, 710 F.3d 394, 407 (6th Cir. 2013) (applying Tennessee law in interpreting a consent decree). But, that view is flatly inconsistent with the D.C. Circuit's precedent; therefore, this Court will look to federal common law here.

agreement language that expressly eschews liability and reserves the right to sue, when the court undertakes to evaluate whether a particular agreement "resolve[d] [the] liability" of a CERCLA plaintiff for section 113(f)(3)(B) purposes. *Compare, e.g.*, *Asarco*, 866 F.3d at 1124–25 *and Chitayat v. Vanderbilt Assoc.*, 702 F. Supp. 2d 69, 81 (E.D.N.Y. 2010) *with Fla. Power*, 810 F.3d at 1004–05; *Bernstein*, 733 F.3d at 212–14; *and DMJ Assocs., LLC v. Capasso*, 181 F. Supp. 3d 162, 168 (E.D.N.Y 2016). The Sixth, Seventh, and Ninth Circuits have considered settlement agreements that contain non-admissions with respect to liability, conditional releases of liability for the claims addressed therein, and unambiguous reservation-of-rights clauses—agreements much like the 2004 Consent Decree at issue here (*see, e.g.*, 2004 Consent Decree ¶¶ 45–46, 48)—and have reached different conclusions regarding whether agreements that contain such clauses should be deemed to have "resolved" liability such that they trigger a claimant's right to bring a contribution action under section 113(f)(3)(B). As explained below, this Court believes that the Sixth and Seventh Circuits have the better approach.

  1. <u>The Sixth And Seventh Circuits Correctly Concluded That Contracts Containing Non-Admissions Of Liability, Broad Reservations Of Rights, And Conditional Covenants Not To Sue Do Not Resolve Liability</u>

  At issue in the Seventh Circuit's *Bernstein* decision was whether two written agreements between the EPA and several different PRPs (agreements that were denominated "Administrative Orders by Consent" ("AOCs")) had resolved those PRPs' liability for the purpose of section 113(f)(3)(B). *See* 733 F.3d at 212–16. In the latter of the two agreements, the EPA had "select[ed] a removal action and cleanup objective[]" for the PRPs to perform. *Id.* at 207. Yet, the written agreement also specifically stated that "[e]xcept as expressly provided in" the covenants not to sue,

"nothing in this [o]rder constitutes a satisfaction of or release from any claim or cause of action . . . under CERCLA, other statutes, or the common law." *Id.* at 203. Furthermore, while the covenants not to sue warranted that the EPA would not proceed to sue the PRPs under section 107(a), the agreement "conditioned" that promise "upon the complete and satisfactory performance" of the terms of the AOC. *Id.* That AOC also stated that the agreement would not "constitute any admission of liability by any (or all) of the Respondents nor any admission . . . of the basis or validity of U.S. EPA's findings, conclusions or determinations[.]" *Id.* at 204. Thus, the Seventh Circuit panel astutely observed that the agreement contained "reservations of rights, conditional covenants, and express disclaimers of liability." *Id.* at 214.

In analyzing the agreement for section 113(f)(3)(B) purposes, the Seventh Circuit panel took particular stock in the fact that the parties had expressly disclaimed any resolution of liability; given that fact alone, the panel noted that it was "very difficult to say . . . that the agreement between the parties constituted a resolution of liability." *Id.* at 212. And in light of this express disclaimer of liability and other indicia within the terms of the contract, the court concluded that, while the PRPs had "'settled' with the EPA[]" insofar as the PRPs had "agreed to perform certain actions in order to remedy an instance of environmental contamination[,]" the parties had not "settl[ed] the issue of *liability* for that contamination—which is what the statute requires[.]" *Id.* (emphasis in original).

The panel further addressed—and rejected—the EPA's argument that the covenants not to sue within the AOC demonstrated that the parties had intended to resolve their liability. *See id.* The Seventh Circuit noted that, while the AOC included

promises by the agency not to sue the PRPs concerning the response actions the agreement covered, within the AOC, the parties had expressly *conditioned* those covenants not to sue upon the PRPs' "complete performance" of the removal and cleanup actions, *see id.* at 212–13, and in the Seventh Circuit's view, such conditional clauses did not demonstrate that the parties had intended to resolve liability, because those clauses' terms made it emphatically clear that "the resolution of liability would not occur until performance was complete," as that would be "the first time at which the covenant would have any effect[,]" *id.*

Ultimately, the Seventh Circuit explained its conclusion with respect to the resolution of liability this way: "[t]he parties to a settlement may choose to structure their contract so that liability is resolved immediately upon execution of the contract. Or, the parties may choose to leave the question of liability open through the inclusion of reservations of rights, conditional covenants, and express disclaimers of liability." *Id.* at 213–14 (citation omitted). The panel concluded that the terms and circumstances of the settlement agreement in *Bernstein* indicated that the parties had opted to do the latter, and it therefore held that the settlement agreement between the EPA and the pertinent PRPs had not resolved liability within the meaning of section 113(f)(3)(B). *See id.* at 214; *see also, e.g.*, *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 691–92 (7th Cir. 2014) (applying these same principles in determining whether a PRP has resolved its liability within the meaning of section 113(f)(3)(B)).

The Sixth Circuit has recently employed similar reasoning to reach similar results. *See, e.g.*, *Fla. Power*, 810 F.3d at 1003–04. Thus, that court has plainly stated that broad reservations of rights, conditional covenants not to sue, and/or language that

"explicitly condition[s] the resolution of liability on performance" can prevent a settlement agreement from being interpreted as one that resolves liability under CERCLA. *Id.* at 1003–04; *see also ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 459 (6th Cir. 2007) (holding that the EPA's reservation of rights "to adjudicate Plaintiff's liability for failure to comply with the AOC, for costs of response . . . costs of injunctive relief" and so on demonstrates no intent to resolve liability). Moreover, like the *Bernstein* court, the Sixth Circuit appears to find that disclaimers of liability weigh against the conclusion that the parties intended to resolve liability within the meaning of section 113(f)(3)(B). *See Fla. Power*, 810 F.3d at 1004 ("This provision parallels the non-admission of liability provisions in the *ITT Industries* and *Bernstein* AOCs." (citations omitted)); *ITT Indus.*, 506 F.3d at 460 ("[P]articipation in this Consent Order does not constitute an admission of liability[.]").

This reasoning was on full display in the Sixth Circuit's *Florida Power* case. In that case, the court examined whether two Administrative Orders of Consent resolved liability within the meaning of section 113(f)(3)(B)—AOCs that expressly provided that "[f]ollowing satisfaction of the requirements of this Consent Order, plaintiff shall have resolved its liability to EPA[.]" 810 F.3d at 1004 (alterations omitted). In both AOCs, the EPA also "broadly reserved its 'right to take any enforcement action pursuant to CERCLA or any other available legal authority . . . for any violation of law or this Consent Order[,]'" *id.* at 1003 (alteration omitted), and while one of the AOCs also contained an express disclaimer of liability, the other AOC contained no statement on liability either way, *see id.* at 1004. Taking all of these provisions into consideration, the Sixth Circuit held that these agreements did not resolve liability within the meaning

of section 113(f)(3)(B), because the AOCs "expressly condition[ed] the resolution of liability on performance of the contract, as opposed to resolving liability on the contract's effective date[,]" and also "broadly reserve[d] the EPA's rights." *Id.* at 1005. In this regard, courts concluded that there were "no material differences between the AOCs in [the Sixth Circuit's *ITT* case] and *Bernstein* that warrant[ed] a different outcome[.]" *Id.* at 1004.[11]

        2.  <u>The Ninth Circuit Mistakenly Characterizes Settlements That Contain Conditional Releases, Non-Admissions, And Broad Reservations Of Rights As Agreements That "Resolve" Liability For The Purpose Of CERCLA Section 113(f)(3)(B)</u>

By contrast, the Ninth Circuit considered whether a settlement agreement "resolved [the] liability" of a PRP within the meaning of section 113(f)(3)(B) just last year, and it appears to have charted its own course in analyzing the effect of disclaimers of liability, conditional releases, broad reservations of rights, and the like. *See Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108 (9th Cir. 2017). The panel in *Asarco* determined (unpersuasively, in this Court's view) that the Sixth and Seventh Circuits had misunderstood Congress's intent with respect to section 113(f)(3)(B), *see id.* at 1124–25, and it concluded that conditional covenants and disclaimers of liability in a settlement agreement are essentially irrelevant to the determination of whether a PRP had resolved its liability, *see id.* at 1125.

The *Asarco* court began the relevant analysis by accepting the premise that, in

---

[11] In *ITT*, the Sixth Circuit held that an Administrative Order by Consent "did not resolve any of the plaintiff's liability for at least two reasons." *Fla. Power*, 810 F.3d at 1002. "First, the EPA broadly reserved its rights to take legal action to adjudicate the plaintiff's liability for failure to comply with the AOC, for costs of response (past, present, or future), for costs of injunctive relief or enforcement, criminal liability, and other damages. And, '[s]econd, the plaintiff had not conceded the question of its liability, and the AOC expressly stated that the plaintiff's 'participation in this Consent Order does not constitute an admission of liability.'" *Id.* (quoting *ITT*, 506 F.3d at 460).

order to qualify as having resolved liability for the purpose of section 113(f)(3)(B), "a settlement agreement must determine a PRP's compliance obligations with certainty and finality." *Id.* at 1124 (citations omitted). But the panel then proceeded to disclaim the significance of certain terms of an agreement that ordinarily indicate the parties' intention to leave the matter of liability for the compliance obligations that the PRP agrees to undertake open and unresolved. For example, the circuit stated that it "disagree[d] with the Sixth and Seventh Circuits' holdings in *Florida Power* and *Bernstein*" concerning conditional covenants not to sue, *id.*, *not* because those circuits were wrong to reason that such language means that liability is not resolved until the competition of performance, as a matter of fact, but because, as a matter of policy, settlement agreements of this nature ordinarily and necessarily contain such conditional language, and thus, none would ever count as resolutions of liability for section 113(f)(3)(B) purposes if interpreted in this fashion, *see id.* (explaining that "CERCLA prevents a covenant not to sue from taking effect until the President certifies that remedial action has been completed"; therefore, if such a condition served as a barrier to resolution of liability under section 113(f)(3)(B), "it is unlikely that a settlement agreement could ever resolve a party's liability" (alterations, internal quotation marks, and citation omitted)). Put another way, the *Asarco* court appears to have viewed a covenant not to sue that is conditioned on completed performance as merely a mechanism for enforcement of the agreement's terms, rather than a statement regarding the status of liability for the claims addressed in the agreement, and thereby flatly rejected the Seventh Circuit's conclusions regarding the significance such language. *See id.* ("An agreement may 'resolve' a PRP's liability once and for all without

hobbling the government's ability to enforce its terms if the PRP reneges." (alteration omitted)).

The *Asarco* court used similar logic when it concluded, contrary to the Sixth Circuit in *Florida Power*, that "it matters not that a PRP refuses to concede liability in a settlement agreement." *Id*. at 1125. The reasoning that the circuit offers to justify this view is rooted in policy—*i.e.*, its belief that "Congress' intent in enacting section 113(f)(3)(B) was to encourage prompt settlements that establish PRP's cleanup obligations with certainty and finality[,]" and its concern that "requiring a PRP to concede liability may discourage PRPs from entering into settlements because doing so could open the PRP to additional legal exposure." *Id*. And it sidestepped consideration of what the parties' themselves intended with respect to liability when they inserted a non-admissions clause into the agreements at issue. Thus, notwithstanding the clear congressional mandate that "liability" for response actions actually be "resolved" by the settlement, 42 U.S.C. § 9613(f)(3)(B), the *Asarco* court held that "a covenant not to sue or release from liability conditioned on completed performance does not undermine such a resolution, nor does a settling party's refusal to concede liability." *Asarco*, 866 F.3d at 1125.

The primary concern that this Court has with the Ninth Circuit's reasoning concerning disclaimers of liability in a settlement agreement in particular is that the Ninth Circuit's position results in a situation in which parties who have clearly opted to set aside the resolution of the PRP's "liability"—*i.e.*, its legal responsibility—in the context of an agreement to undertake (or pay for) response actions are nevertheless deemed to have "resolved its liability" for the purpose of section 113(f)(3)(B). As the

Seventh Circuit astutely exclaimed, in the face of an explicit disclaimer of liability in a written settlement agreement, "[i]t is very difficult to say . . . that the agreement between the parties constituted a resolution of liability." *Bernstein,* 733 F.3d at 212. And nothing in the statute suggests that Congress intended section 113(f)(3)(B) to be read to trigger contribution rights based merely on the fact that a settlement agreement contains terms that *specify* "a PRP's *obligations* for a least some of its response actions[,]" *Asarco*, 866 F.3d at 1125 (emphasis added); indeed, the statute Congress penned plainly requires that any such agreement "*resolve*[] [the PRP's] *liability*[,]" 42 U.S.C. § 9613(f)(3)(B) (emphasis added), and an agreement that delineates "a PRP's compliance obligations"—even "with certainty and finality"—*Asarco*, 866 F.3d at 1124, does not thereby "resolve[] [the PRP's] *liability*" within the plain meaning of that statutory phrase, 42 U.S.C. § 9613(f)(3)(B) (emphasis added); *see also* 42 U.S.C. § 9607(a) (holding certain listed persons strictly "liable" for specified cleanup costs). In other words, if Congress had intended to provide contribution rights for any person who has merely entered into a settlement agreement with the United States or a State concerning a CERCLA response action or its costs, it certainly could have said so. Instead, Congress mandated that, in order to give rise to the right to bring a contribution action, the agreement must "resolve [the contribution claimant's] liability to the United States or a State for some or all of a response action or for some or all of the costs of such action[,]" *id.* § 9613(f)(3)(B), which, in this Court's view, necessarily means that a settlement that expressly disclaims liability does not count.

Nor is the Ninth Circuit's analysis persuasive with respect to the appropriate evaluation of conditional covenants not to sue. In *Bernstein*, the Seventh Circuit made

clear that the existence of a covenant not to sue in a settlement agreement was a contract term that *the agency* had pointed to in order to support its own section 113(f)(3)(B) contention. Specifically, because the parties in *Bernstein* had included such a release in the agreements at issue, the agency argued that the agreements did, in fact, resolve the liability of the PRPs concerning the cleanup costs and remediation that the agreements addressed. *See Bernstein*, 733 F.3d at 212 (noting the EPA had argued that the AOCs resolved the PRPs liability because "[i]n the AOCs, the settling PRPs promised to perform certain removal actions and EPA promised not to sue concerning those actions"). The Seventh Circuit's response was the imminently reasonable assertion that "[i]f the EPA's covenant not to sue is the contemplated 'resolution of liability' in this case . . . then, by the terms of the AOC itself, the resolution of liability would not occur until performance was complete, which is the first time at which the covenant could have any effect." *Id.* In rejecting this contention, it appears that the Ninth Circuit misread *Bernstein* to hold that an agreement that contains such a conditional covenant cannot by any means be construed as resolving liability for the purpose of section 113(f)(3)(B), *see Asarco*, 886 F.3d at 1124 (retorting that "[a]n agreement may 'resolve' a PRP's liability once and for all without hobbling the government's ability to enforce its terms if the PRP reneges" (alteration omitted)), when *Bernstein* actually stands for the far more modest proposition that the reasonable reservation of an agency's right to enforce the terms of the agreement through a conditional release or conditional covenant not to sue is not *itself* indicative of the parties' intent to resolve all liability by virtue of the agreement, particularly when the specified conditions for such resolution have not been satisfied.

For what it's worth, this Court also questions the Ninth Circuit's view of the requirements for "resolv[ing] [] liability" under section 113(f)(3)(B) from a practical perspective.  First of all, it is difficult to see how a settlement agreement can meaningfully "decide[], determine[], or settle[]" the "nature, extent, or amount" of a PRP's liability if that agreement has not established that the PRP is in fact liable.  *Cf. Queen v. Schultz*, 747 F.3d 879, 889 (D.C. Cir. 2014) (suggesting that whether a defendant is liable must be established before determining the scope of that liability).  Thus, it is hard to know what to do when a settlement agreement expressly disclaims any finding or admission of liability; apparently, under the Ninth Circuit's interpretation, such language must simply be ignored.  *But see* Restatement (Second) of Contracts § 202(2) ("A writing is interpreted as a whole[.]"); *id.* § 202(3) ("Unless a different intention is manifested, where language has a generally prevailing meaning, it is interpreted in accordance with that meaning[.]").  And this is no rare happenstance, even the Ninth Circuit acknowledges that parties to a CERCLA settlement may "often expressly refuse to concede liability under a settlement agreement," *Asarco*, 866 F.3d at 1123, and it is certainly odd to give non-admissions of liability that clearly mattered to the parties when they struck their bargain no effect in the context of a statute that turns on whether a settlement has resolved the liability of a party, *see Collins v. Pension Benefit Guar. Corp.*, 881 F.3d 69, 72 (D.C. Cir. 2018 ) ("It is a commonplace of contract law that we will give the parties' agreement the meaning they have given it themselves.").

The concern that giving effect to the parties' disclaimer of liability will discourage PRPs from entering into "prompt settlements that establish PRPs' cleanup

obligations with certainty and finality[,]" *Asarco*, 866 F.3d at 1125, might well be justified (*see* Def.'s Reply at 22–23), but it should not compel a different outcome, for that result was manifestly insufficient to deter Congress from setting the "resolved its liability" bar for the triggering of the contribution rights that the statute plainly confers. Moreover, it is entirely possible that, from a PRP's perspective, the benefit derived from entering into a timely settlement agreement that disclaims any finding of liability outweighs the cost of obtaining the right to contribution under section 113(f)(3)(B), such that "the timely cleanup of hazardous waste sites" that Congress plainly sought to promote, *Burlington N.*, 556 U.S. at 602, will occur nonetheless.  Thus, even if a PRP that is considering a disclaimer of liability faces a Sophie's choice in the context of section 113(f)(3)(B)—*i.e.*, either settle with a disclaimer and not receive contribution rights or go to trial on the question of CERCLA liability—it is not necessarily the case that the PRP would decline to settle, and would opt instead to engage in protracted and potentially lengthy litigation, with the concomitant risk of being found liable for a strict liability CERCLA offense, all to the continued detriment of the "air, earth, rivers, and sea[,]" Rachel Carson, *Silent Spring* (1962).  In any event, *resolution* of liability in the context of a settlement is plainly what the pertinent statutory provision demands in order for the right to contribution to be triggered, and instead of rewriting contractual agreements, courts should have faith that the relevant stakeholders can effect a prompt cleanup (as Congress prefers), in a manner that disclaims the PRP's liability for the response action (as the PRP desires) while also releasing any other claims (as the agency is willing to do), within the parameters of the law as written.

**B. The 2004 Consent Decree Did Not "Resolve" Guam's Liability For The Ordot Landfill Hazardous Waste Response Actions It Has Undertaken**

Of course, as noted earlier, whether or not contractual terms such as a disclaimer of liability or a covenant not to sue in a settlement agreement with the United States "resolve[s]" a party's liability, and thereby gives rise to a right to seek contribution under section 113(f)(3)(B), must be determined through "a case-by-case analysis of a particular agreement's terms." *Asarco*, 866 F.3d at 1125. This Court now turns its attention to various pertinent provisions of the 2004 Consent Decree—namely, its clear disclaimer of liability, its conditional release of liability for the claims the United States had brought against Guam in a CWA complaint, and two complementary reservation-of-rights clauses—and addresses whether, in light of these provisions, the parties to the 2004 Consent Decree can be said to have "decided, determined, or settled" the "nature, extent, or amount" of Guam's liability for the response actions or costs relating to the Ordot Landfill. *Bernstein*, 733 F.3d at 212.

1. The 2004 Consent Decree's Disclaimer Of Liability, Broad Reservation-Of-Rights Clause, And Conditional Resolution Of Liability Are Not Indicative Of An Intent To Resolve Guam's Liability

The very first affirmative representation Guam and the EPA make in the 2004 Consent Decree (following an unremarkable series of "Whereas" clauses) is that the agreement itself is "based on the pleadings, before taking testimony or adjudicating any issue of fact or law, *and without any finding or admission of liability against or by the Government of Guam*." (2004 Consent Decree 18, lines 7–9 (emphasis added).) This "therefore" provision leaves no room for ambiguity; it specifies exactly what materials the parties had access to at the time they signed the Consent Decree (few); which legal and factual issues remained unexamined (all of them); and what liability Guam is

accepting by virtue of consenting to settlement (none).  Thus, this contract language

plainly reflects the parties' intention *to leave the question of liability unresolved*,

despite the fact that Guam was proceeding to consent to engage in the immediate

cleanup of the Ordot Landfill by virtue of entering into the agreement.  (*Id.* ¶ 9(a)

(requiring Guam to start taking steps within thirty days of the entry of the consent

decree).)  *Cf. Bernstein*, 733 F.3d at 212 ("They agreed to perform certain actions in

order to remedy an instance of environmental contamination.  But they did not settle the

issue of *liability* for that contamination[.]" (emphasis in original)).

     The argument that Guam "resolved its liability" to the United States by executing

the 2004 Consent Decree is thus facially untenable.  But that conclusion becomes even

more far-fetched when one considers the broad reservation of rights that the EPA

inserted into this contract.  The 2004 Consent Decree agreement specifically provides

that

> [n]othing in this Consent Decree shall limit the ability of the United
> States to enforce any and all provisions of applicable federal laws
> and regulations for any violations *unrelated to the claims in the
> Complaint* or *for any future events that occur after the date of
> lodging of this Consent Decree*.

(2004 Consent Decree ¶ 46 (emphasis added).)  And presumably to reinforce the point

that Guam could still be held potentially liable notwithstanding the settlement, the

Consent Decree also states that "[e]xcept as specifically provided herein, the United

States *does not waive any rights or remedies available to it for any violation by the

Government of Guam of federal and territorial laws and regulations*."  (*Id.* ¶ 48

(emphasis added).)

     Much like the disclaimer of liability clause, the takeaway from these two

provisions in the 2004 Consent Decree is that the United States was reserving its right to pursue *any* violation of law that Guam may have committed other than those articulated in the 2002 CWA complaint to which the settlement agreement was addressed, and the scope of the 2002 CWA complaint was similarly clear: it asserted that Guam was liable under the CWA and should be ordered to pay monetary penalties and to cease the discharge of hazardous chemicals into the Lonfit River. (*See* CWA Compl. ¶¶ 25–27, 34–35, Prayer for Relief.) Thus, the careful wording of the 2004 Consent Decree's reservation-of-rights clause makes clear that the United States retained its rights to sue Guam under countless other environmental statutes for the response actions and costs relating to any cleanup at the Ordot Landfill, and it can hardly be viewed as evidencing the parties' intention that *this* settlement agreement resolved Guam's liability for any response costs or response actions that those other statutes might demand. *See Fla. Power*, 810 F.3d at 1006; *Bernstein*, 733 F.3d at 212–13; *ITT Indus.*, 506 F.3d at 459–60.

If any more proof that the 2004 Consent Decree did not resolve Guam's liability is needed, one need look no further than paragraph forty-five of the 2004 Consent Decree, which unequivocally establishes the agreement's scope, by stating that

> [e]ntry of this Consent Decree and compliance with the requirements herein shall be in full settlement and satisfaction *of the civil judicial claims of the United States against the Government of Guam as alleged in the Complaint filed in this action* through the date of the lodging of this Consent Decree.

(2004 Consent Decree ¶ 45 (emphasis added).) Again, the parties clearly contemplated Guam's compliance with the 2004 Consent Decree as settling and satisfying *only* the CWA claims that the EPA had brought against Guam. And because Guam was plainly

33

left fully exposed to other environmental suits and allegations—say, a subsequent suit brought by the United States to recover costs under CERCLA section 107(a)—the language above cannot be reasonably interpreted to evince the parties' intent that the 2004 Consent Decree resolved Guam's liability for the response costs or actions associated with the cleanup of the Ordot Landfill under section 107(a) or any other statute.

Also noteworthy is the fact that paragraph 45 of the 2004 Consent Decree explicitly conditions the resolution of whatever CWA liability that the 2004 Consent Decree addresses on both the "[e]ntry of this Consent Decree *and compliance with the requirements herein*." (*Id.* (emphasis added).) Thus, the agreement could not be clearer that the "entry of this Consent Decree" *alone* does not settle or resolve any of the claims against Guam—that is, whatever circumstances might be inferred from a general conditional covenant not to sue, *this* agreement states that the resolution of Guam's liability for the specified claims does not occur until Guam has actually complied with all of the Consent Decree's requirements.[12]

In short, it is clear to this Court that, taken together, the terms of the 2004 Consent Decree do not support the conclusion that Guam and the EPA intended to resolve Guam's liability for any response actions or costs relating to the Ordot Landfill. (*Id.* at 18 (Therefore Clause), ¶¶ 45–46, 48.) Under the terms of that settlement, Guam and the United States unquestionably reached a consensus that Guam would engage in

---

[12] Indeed, because the Ordot Landfill cleanup is still ongoing (*see* Am. Compl. ¶ 14), it remains to be seen whether Guam will actually be released from the specter of liability per this agreement in the future. *See Fla. Power*, 810 F.3d at 1004 (explaining that "language" that "explicitly condition[s] the resolution of liability on performance" goes "a step beyond [] conditional covenants not to sue and reservations of rights" in preventing the resolution of liability).

certain response actions to clean up and remediate the dump, but the 2004 Consent Decree does not decide—much less determine with finality and certainty—who bears the ultimate responsibility for the costs of that cleanup. *Cf. Bernstein*, 733 F.3d at 212. Consequently, the 2004 Consent Decree did not "resolve[]" Guam's "liability" within the meaning of section 113(f)(3)(B), and absent such a resolution, Guam can maintain its cost-recovery claim under section 107(a), given that the six-year statute of limitations for the remediation and recovery actions that Guam has and is taking has not even begun to run. *See* 42 U.S.C. § 9613(g)(2)(B).[13]

    2.  The United States's Argument That The 2004 Consent Decree Resolved Guam's Liability Distorts Both The Provisions Of That Contract And Relevant Case Law

To resist the above conclusion, the United States makes several pointed arguments that are largely aimed at the just-discussed provisions of the 2004 Consent Decree. In this Court's view, each of Defendant's arguments either warps the underlying text of CERCLA and/or the 2004 Consent Decree beyond recognition, or advances a dubious reading of case law from the courts of appeals.

For example, the United States maintains that, because the 2004 Consent Decree "resolved Guam's liability for the civil penalties paid and the injunctive relief performed under the decree," it should be construed as having resolved Guam's liability for the purpose of CERCLA's section 113(f)(3)(B). (Def.'s Reply at 19.) But as has already been explained, CERCLA has its own (strict) liability provision, *see* 42 U.S.C. § 9607, and the complaint that the 2004 Consent Decree settles requested only civil

---

[13] Because this Court concludes that the 2004 Consent Decree did not resolve liability within the meaning of section 113(f)(3)(B), it need not consider whether a consent decree that addresses claims under the CWA can qualify as a "settlement" within the meaning of section 113(f)(3)(B) (*see* Pl.'s Opp'n at 22–26; 40–45), or any of Guam's myriad other contentions (*see* Pl.'s Opp'n at 46–51).

monetary penalties and an injunction requiring Guam to bring the Ordot Landfill *into compliance with the CWA*. (*See* CWA Compl. ¶¶ 25–27, 34–35, Prayer for Relief.) Consequently, under the terms of the agreement, once Guam completes the response activities laid out in the 2004 Consent Decree, it will have resolved its liability *only* with respect to the prescribed fines and any outstanding obligation to bring the landfill into compliance with the CWA. (*See* 2004 Consent Decree ¶ 7 (stating that "[t]he Government of Guam shall correct all compliance problems that form the basis for the Complaint filed in this action by undertaking the action identified below within the specified times").) The allocation of costs for CERCLA purposes is not covered, and thus would remain unresolved.

In a similarly bewildering reading of the agreement between Guam and the EPA, the United States argues that the 2004 Consent Decree contains no "specific covenant not to sue, let alone one" that resolves liability "in a conditional manner." (Def.'s Reply at 24.) Yet, as the United States readily admits (*see id.*), the consent decree explicitly states that "entry of this consent decree *and compliance with the requirements herein* shall be in full settlement and satisfaction of" the complaint's claims (2004 Consent Decree ¶ 45 (emphasis added)). This language establishes duties that are inherently conditional—*i.e.*, no release of liability will actually occur until (1) the Consent Decree has been entered, and (2) Guam has fully complied with the terms of the Consent Decree. And because the removal and remediation work required in the 2004 Consent Decree is still ongoing (*see* Am. Compl. ¶ 14), it is still possible for Guam to fall out of compliance with the 2004 Consent Decree—a circumstance that would seemingly resuscitate the United States's CWA claims. *See Fla. Power*, 810

F.3d at 1004 (concluding that language that stated that "[f]ollowing satisfaction of the requirements of this Consent Order, [plaintiff] shall have resolved [its] liability to EPA" amounted to a conditional resolution of liability (alteration in original)). It is thus difficult to accept the United States's suggestion that the 2004 Consent Decree's release language is unconditional.

The Eighth Circuit's decision in *Dravo Corporation v. Zuber*, 13 F.3d 1222 (8th Cir. 1994), is not to the contrary. (*See* Def.'s Reply at 23 (citing *Dravo Corp.*, 13 F.3d at 1225–26).) There, the Eighth Circuit examined whether the parties had resolved liability for section 113(f)(2) purposes within the context of a *de minimis* settlement that had provided that the defendants "will have resolved" their liability "by entering into and carrying out" the terms of that settlement. 13 F.3d at 1226 (internal quotation marks omitted). *De minimis* settlements constitute a unique type of settlement within CERCLA's statutory scheme, and are only available when a particular PRP has minimal responsibility for the contamination of a hazardous waste site. *See* 42 U.S.C. § 9622(g)(1). Congress has repeatedly emphasized that the President shall enter into and encourage *de minimis* settlements "as promptly as possible[,]" *id.*, "as soon as possible[,]" *id.* § 9622(g)(3), and "as soon as practicable[,]" *id.* § 9622(g)(10). And in the context of a *de minimis* settlement that expressly incorporated such statutory language, the Eighth Circuit concluded that the parties had not intended to leave the issue of the defendants' liability unresolved. *See* 13 F.3d at 1226; *see also id.* (reasoning that, in the *de minimis* settlement context, a statement of resolution "subject to a condition subsequent" qualifies as a resolution of liability).

Thus, the nature of the settlement (*de minimis* versus substantive) is an important

distinction that differentiates the instant case from the facts of *Dravo Corporation*. As the D.C. Circuit and the Supreme Court have both explained, "[i]dentical words [within a statute] may have different meanings where 'the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another.'" *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996) (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). This cautionary sentiment is especially apt in the instant case, given that "the language of CERCLA is not a model of precise crafting[.]" *Pakootas v. Teck Cominco Metals, LTD.*, 830 F.3d 975, 985 (9th Cir. 2016). As relevant here, Congress has explicitly and repeatedly authorized the prompt, immediate, and final resolution of liability in the context of *de minimis* settlements, but *not* for other types of settlements of CERCLA claims. This means that Congress has provided contextual clues that attach different meanings to the phrase "resolved its liability" as that phrase appears in sections 113(f)(3)(B) and 122(g)(5), and this difference in context suffices to warrant different interpretations. Therefore, even if being "subject to condition subsequent" does not interfere with resolving liability under section 122(g)(5), *Dravo Corp.*, 13 F.3d at 1226, that holding does not necessarily suggest that, in a context in which liability must actually be negotiated and established, the parties intended to resolve liability despite including a condition subsequent for the purpose of section 113(f)(3)(B), *see Fla. Power*, 810 F.3d at 1004.

The United States also appears to attach significance to the fact that the instant case involves a "judicially-approved consent decree that also constituted a final

judgment[,]" rather than an "administrative settlement[.]"  (Def.'s Reply at 20.)  But it fails to explain why this distinction makes a difference with respect to an evaluation of its terms, and it does not cite a single case that supports the suggestion that this distinction matters when it comes to determining whether a settlement agreement resolves liability under section 113(f)(3)(B).  *Compare Asarco*, 866 F.3d at 1122 (examining whether a consent decree had "determined, decided, or settled" the "nature, extent, or amount of a PRP's *liability*") *with Bernstein*, 733 F.3d at 212 (applying the same inquiry to administrative settlements).

Finally, the United States seeks to distinguish this case from the Sixth Circuit's reasoning in *ITT Industries* and *Florida Power* by maintaining that the reservation-of-rights clauses in those cases were "substantially broader" than the reservation of rights in the 2004 Consent Decree.  (Def.'s Reply at 20; *see also id.* at 20–22.)  This Court has dutifully compared the clauses in each of those cases with the reservation-of-rights clause at issue here, and it cannot agree with the United States's characterization.  In *ITT Industries*, "the EPA expressly reserve[d] its rights to legal action to adjudicate Plaintiff's liability for failure to comply with the AOC, for costs of response (past, present or future), for costs of injunctive relief of enforcement, criminal liability, and other damages."  506 F.3d at 459; *see id.* ("U.S. EPA retains all of its rights under this Consent Order and CERCLA[.]" (internal quotation marks omitted)).  The reservation of rights in *Florida Power* was similar; it "broadly reserved [the EPA's] right to take any enforcement action pursuant to CERCLA or any other available legal authority . . . for any violation of law or this Consent Order."  810 F.3d at 1003 (internal quotation marks omitted).

Neither of these reservation-of-rights clauses is any broader than the one at issue in this case. Although no mention of CERCLA is made in the relevant portions of the 2004 Consent Decree, the EPA expressly reserved its rights "to enforce any and all provisions of applicable federal laws and regulations for *any violations unrelated to the claims in the Complaint*" (2004 Consent Decree ¶ 46 (emphasis added)), which patently includes any violations under CERCLA, and to be doubly clear, the agreement also stated that "except as specifically provided herein, the United States *does not waive any rights or remedies* available to it for *any* violation . . . of federal and territorial laws and regulations" (*id.* ¶ 48 (emphasis added)). Therefore, it appears that the United States has discerned a material difference where there is none: *all* of these provisions plainly reserve the right of the United States to take any other action against the signatory of the agreement for any violation of law, and if the 2004 Consent Decree is narrower, it is only marginally so, given that the United States only expressly waived its ability to seek the monetary penalties and compliance actions that it requested for the CWA violations that were specified in the underlying complaint.

In the final analysis, then, the 2004 Consent Decree between Guam and the EPA did not "resolve[]" Guam's "liability" within the meaning of section 113(f)(3)(B), as evidenced principally by the following provisions: (1) the statement disclaiming any admission of liability on Guam's part (*see id.* at 18 (Therefore Clause)); (2) the broad reservation-of-rights clauses that benefited the United States (*see id.* ¶¶ 46, 48); and (3) the omission of any language that immediately and effectively insulated Guam from future lawsuits by the EPA under CERCLA sections 106(a) and 107(a).

## IV.    CONCLUSION

For the reasons explained above, this Court has concluded that, in order to resolve liability within the meaning of CERCLA section 113(f)(3)(B), a settlement agreement must "decide[], determine[], or settle[]" the "nature, extent, or amount of a PRP's liability," *Bernstein*, 733 F.3d at 212, and that the 2004 Consent Decree between Guam and the EPA failed to do so because the provisions within that agreement—from a conditional release of liability to an overly broad reservation of rights to a clear non-admission of liability—demonstrate that the parties did not reach an agreement as to *whether* Guam was liable for the cost of the Ordot Landfill cleanup, much less determine the scope of its liability.  Consequently, Guam's right to contribution under section 113(f)(3)(B) has not yet been triggered, which means that it is not precluded from proceeding via a cost-recovery action under section 107(a).  As a result, this Court determined, on September 30, 2018, that the United States's motion to dismiss under 12(b)(6) must be **DENIED.**


DATE:  October 5, 2018                    *Ketanji Brown Jackson*
                                          ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                          KETANJI BROWN JACKSON
                                          United States District Judge